1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

  - - - - - - - - - - - -    X

UNITED STATES OF AMERICA,    :   09 CR 591

                             :


     -against-               :
                                 United States Courthouse
                                 Brooklyn, New York
DUDLEY JERRICK,              :

                                 July 27, 2010
          Defendant.         :   3:00 o'clock p.m.

  - - - - - - - - - - - -    X


                    TRANSCRIPT OF CONFERENCE
                 BEFORE THE HONORABLE JOHN GLEESON
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:        LORETTA E. LYNCH
                           United States Attorney
                           BY: ALLON LIFSHITZ
                           Assistant United States Attorney
                           271 Cadman Plaza East
                           Brooklyn, New York


For the Defendant:         KANNAN SUNDARAM, ESQ.
                           Federal Defenders


Court Reporter:            Gene Rudolph
                           225 Cadman Plaza East
                           Brooklyn, New York
                           (718) 613-2538

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.
```

2

1        THE COURT:  Okay.  State your appearances, please.

2        MR. LIFSHITZ:  Allon Lifshitz for the United States.

3   Good afternoon, Your Honor.

4        THE COURT:  Good afternoon.

5        MR. SUNDARAM:  Kannan Sundaram, Federal Defenders,

6   for Mr. Jerrick.

7        Good afternoon.

8        THE COURT:  Good afternoon.

9        All right.  I have your submissions on this

10  disclosure issue.  I was hoping we could maybe get down to

11  brass tax and find out exactly to the extent you can tell us

12  what you are looking for.  They are coming down, I don't have

13  my papers in front of me at the moment.

14       To some extent your discovery requests have great

15  breadth to them.  It might cause the government, if granted,

16  to have to go back and find every case in which a courier said

17  they didn't know there were drugs.  I am not about to do that.

18       On the other hand, I do recall, I think maybe all of

19  us, if we don't recall them, we are familiar with cases in

20  this district in which -- courier cases in this district where

21  other events caused legitimate defenses to be raised.  I

22  recall in particular when the airline, corrupt airline

23  employees were prosecuted, many of them in my courtroom, and

24  threw a monkey wrench in some of the prosecutions of other

25  couriers who claimed that at the same time their luggage was

3

1    discovered to contain cocaine, and unbeknownst to them, they

2    alleged.  There were tricky disclosure issues.

3          So I don't want this to be a fishing expedition and

4    we have a trial coming up on Monday, right?

5          MR. SUNDARAM:  Correct.

6          MR. LIFSHITZ:  Yes, Your Honor.

7          THE COURT:  Are there other cases involving the use

8    of coffee cans to smuggle drugs in the luggage of people who

9    turned out to be dupes?  Are there cases like that in your

10   office or have there been recently?

11         MR. LIFSHITZ:  I am not aware of any, Your Honor.

12   But I am not prepared to say there have not been as a blanket

13   matter.

14         THE COURT:  Could you find out?  Even if you don't

15   think you should disclose it, then you can tell me.

16         MR. LIFSHITZ:  Okay.

17         THE COURT:  Is there any -- extrinsic to this case

18   and to any allegations that have been made or might be made by

19   Mr. Jerrick, is there any evidence of corruption among the

20   airline employees of this airline?  I don't even know which

21   one it is from which this defendant got off a plane?  But any

22   corruption among airline employees of this airline at about

23   the same period of time?  Anything remotely along the lines of

24   using passengers as unwitting dupes?

25         Do you understand what I mean by that?  That was the

4

1   gist of the line of cases I had.

2              MR. LIFSHITZ:  Yes, Your Honor.

3              THE COURT:  What airline was it?

4              MR. LIFSHITZ:  Caribbean Airlines.

5              THE COURT:  Obviously, if there is a bunch of

6   employees of Caribbean Airlines who at the same time

7   Mr. Jerrick came in who, according to the government or the

8   agencies, were planting -- to get drugs through Customs were

9   putting them in the luggage of unwitting passengers, I think I

10  would make you disclose all of that.

11             Is there anything like that?

12             MR. LIFSHITZ:  Not that I am aware of.  I will ask.

13             THE COURT:  Can you make that inquiry?

14             MR. LIFSHITZ:  Yes.

15             THE COURT:  Beyond those kind of targeted requests,

16  could you tell me what, if anything, you think you have a

17  right to require the government to get.

18             MR. SUNDARAM:  Yes, Your Honor.

19             First, on the subject of the -- what --

20             THE COURT:  I'm sorry?  Forgive me.  I should have

21  mentioned this at the outset.

22             This discovery request has reached a head only

23  recently and I was asked today by defense counsel to convene

24  an immediate status conference, which I did.  The defendant is

25  not here.  The record ought to reflect that.  I don't think he

1   needs to be here.  This is a legal issue for which his

2   presence is not required in my judgment.

3           Do you see it any differently?

4           MR. SUNDARAM:  No, Your Honor.

5           In light of the fact that I did request an immediate

6   status conference, and I was prepared to waive my client's

7   appearance, I didn't even contact him and, to be honest, I

8   wasn't -- I thought maybe it would be tomorrow.  I wasn't

9   anticipating that it would be granted so literally.

10          THE COURT:  In your judgment, is his presence

11  required under the rule?

12          MR. SUNDARAM:  No, Your Honor.

13          THE COURT:  All right.  Go ahead.

14          MR. SUNDARAM:  I would like to start responding to

15  the question by focusing on what I think Your Honor referred

16  to as the targeted type of cases.  Now, first, I did -- I did

17  include in my initial discovery letter a case, United States

18  versus against Singh.  That's a case that I am aware of

19  because it came out of our office in 2003, 2004.  It was in

20  our view -- that case was dismissed.  In our view, that case

21  was somehow related to the Kennedy cases that Your Honor is

22  referring to, which I also mentioned the citation, at least

23  the case name, United States against Weatherly and Adams and

24  our contention is that Singh was a passenger on another

25  airline who -- whose flight came in the same day and was -- in

6

1   our view, was the victim of misplaced luggage that was

2   supposed to be -- supposed to be on -- with another passenger.

3   I'm sorry.  Had his name on it but it was -- it was -- the --

4   the defendants in Weatherly -- Weatherly and the -- and his

5   codefendants were being separately prosecuted at the same

6   time.

7           We also -- and there was a -- a bunch of litigation

8   in front of Judge Amon.  I'm sorry for mispronouncing the

9   name.

10          THE COURT:  That's okay.

11          MR. SUNDARAM:  And --

12          THE COURT:  There are a number of times I have

13  mispronounced yours.  You've got a voucher of mispronounced

14  names in here for about a month.

15          MR. SUNDARAM:  Okay.  I will collect on that later.

16          In any event, in that case, this prosecutor's office

17  ended up dismissing the case and, as is the case with

18  dismissed cases, there is no public statement by them as to

19  reason they dismissed it.  As an example, we would be asking

20  for -- for the files or at least for them to -- for the

21  government to produce their papers in that case.

22          THE COURT:  In the Singh case?

23          MR. SUNDARAM:  For your review in the Singh case.

24          THE COURT:  In 2003?

25          MR. SUNDARAM:  Yes.

GR      OCR      CM      CRR      CSR

1    THE COURT:  Denied.

2    MR. SUNDARAM:  As well, there could be -- there are

3 cases -- it -- I don't think it's -- I understand in terms of

4 the breadth this could be characterized arguably as a fishing

5 expedition of sorts.  But in terms of -- by its very nature,

6 we are asking for information that we don't have, that the

7 government may have, which I know you touched upon when you

8 asked Mr. Lifshitz to inquire.

9    For example, there are cases, Singh was a case that

10 was prosecuted and then dismissed.  We are asking for cases

11 along those lines where unwitting passengers -- cases

12 involving unwitting passengers were not prosecuted, anything

13 within the knowledge of the US Attorney's Office that were

14 maybe dismissed earlier or not prosecuted.

15    THE COURT:  You want the files for all people in

16 whose luggage drugs were found and they claim to be -- to lack

17 knowledge and they weren't prosecuted?

18    MR. SUNDARAM:  Well, yes.

19    We are -- I mean -- yes, our request is for

20 documents or at least information relating to those cases.

21 Not necessarily the entire file.  We are not necessarily

22 asking for the files but I am -- we are asking at -- at its

23 core our request is for information.

24    In Stever this was -- this was sought by the defense

25 under Rule 16 and also under Brady.  The Court's decisions, in

8

1   Stever, which I agree, it's a Ninth Circuit case, but it's

2   very recent, the Court did not decide it under Brady.  They

3   decided it under Rule 16 and then the constitutional right to

4   present defense.

5           But my -- our requests were essentially the same.

6   They were worded very similarly and then I made some more

7   particulars based on information we know.

8           But the -- otherwise, our requests were the -- you

9   know, they tracked the same language in terms of requesting

10  reports and documents that the government knows of describing

11  the modus operandi and the characteristics and we are talking

12  of organizations that traffic drugs through Guyana.

13          I have -- I mean, we have done some of our own

14  investigation to, you know, in terms of State Department

15  bulletins, reports of that nature.  We don't have access to

16  necessarily the actual training materials that special agents,

17  ICE agents and DEA agents might receive.

18          THE COURT:  Let me interrupt you.  Sorry.

19          I know you are not -- I believe you are not doing a

20  fishing expedition.  You are trying to represent your client.

21  But this needs to be more targeted, in my respectful opinion.

22          You ask for all documents regarding drug trafficking

23  organizations that import drugs from Guyana.   I would never

24  order that in 100 years.  People could get killed and there is

25  not even any effort to tie it in to a defense in this case.

1          Do you mean, the use of unwitting dupes in Guyana at

2     or about the time your client was arrested?  Or do you really

3     mean that?  I would never do that.  I don't think there is a

4     judge in the world that would grant that request responsibly.

5          MR. SUNDARAM:  I -- I can --

6          THE COURT:  It is not even limited in time.  A 1950s

7     file about Guyanese drug traffickers would have to be

8     disclosed to you?

9          MR. SUNDARAM:  That -- I wouldn't advocate that.

10          THE COURT:  You have asked for it thought.  Now you

11     are doing the advocating.

12          Tell me what you are advocating for that is a little

13     more targeted than this.

14          MR. SUNDARAM:  Our defense, which I think -- which

15     I -- I think the government made a point that Stever is

16     inapposite, even if the Court were to otherwise be inclined to

17     agree with that decision of another circuit, that Stever

18     inapposite because in that case the -- the request put out the

19     defense.  I don't think -- that certainly isn't apparent to me

20     from the decision in Stever.

21          In any event --

22          THE COURT:  Do you think I would be less mystified

23     by this if I knew your defense?

24          MR. SUNDARAM:  I can tell you based on what --

25          THE COURT:  I am not telling you to tell me your

1  defense.

2          Do you think it would help me if I knew your

3  defense?

4          MR. SUNDARAM:  Judge, if I set forth an example of a

5  potential defense, it might --

6          THE COURT:  Okay.

7          MR. SUNDARAM:  It might help me answer your question

8  about targeting this request regarding information about drug

9  trafficking organizations that really I should have -- I meant

10  to say the -- that traffic through Guyana because Guyana,

11  based on the research that I have done, and I think it's

12  somewhat well-known, is considered a transshipment country as

13  opposed to a source country.  The source country is usually

14  Colombia or another South American country.

15          Guyana, according to various State Department

16  bulletins, has been -- I think to some extent this was

17  supported by some of the discovery that was given to us

18  regarding the expert that the government initially intended to

19  use, Timothy Varian.  This is in his own testimony from prior

20  cases, that Guyana is a target country by drug trafficking

21  organizations to use as a transshipment country because of the

22  high incidence of corruption and lack of security and

23  political issues that exist in Guyana and this -- I understand

24  I didn't focus on any particular year but I think the reports

25  that I have read are fairly recent, as in 2009, 2008.

1          The Kennedy case which involved corrupt baggage

2     handlers in Guyana working in unison with corrupt baggage

3     handlers at the Kennedy Airport involved employees of

4     Guyanese -- of an airline that flew out of Guyana and baggage

5     handlers that were in Guyana that are --

6          THE COURT:  That's the 2003 case?

7          MR. SUNDARAM:  Yes.

8          Even if the request would just focus on the last

9     five to seven years, we are talking about from that time --

10         THE COURT:  All documents in the government's

11    possession regarding drug trafficking organizations that

12    imported through Guyana in the last five or seven years?

13         MR. SUNDARAM:  What I am asking -- I am asking for

14    and what I should have asked for, to make this more focused

15    and precise, is information -- is training, is what the --

16    what information -- which is included in here but I didn't

17    limit it, the officer training materials, the -- what the

18    government teaches its own agents about -- about drug

19    trafficking through Guyana, through the airport.

20         THE COURT:  Which government did you have in mind?

21    Our government or the Guyanese government?

22         MR. SUNDARAM:  Our government.

23         I am talking -- I am not asking the Eastern District

24    US Attorney's Office to go outside of its own office

25    necessarily but I am talking about the training materials that

1   they -- that ICE, the DEA give their own agents in terms

2   of -- in terms of what to look for in intercepting drug

3   shipments --

4           THE COURT:  Okay.

5           MR. SUNDARAM:  -- through Guyana.  I think where

6   that ties in is because of the -- the level of corruption and

7   the ease with which people other than -- either corrupt

8   airline employees and just people in general, how easy it is

9   to get access to somebody's luggage in Guyana.  That would be

10  how I think it is relevant, may be relevant to our defense.

11          My client's statements to the agents in this case

12  were, as I think the Court is aware from some of the

13  papers -- from the litigation that we have -- that's already

14  been in front of you regarding the -- what parts of the

15  statements should and shouldn't come in, from the beginning he

16  said I -- I don't know -- he said this is my -- this is my

17  luggage.  I bought these.  I didn't know what was inside them.

18          Among the -- among what we have unearthed through

19  newspaper articles, which have been fairly recent and common,

20  they are -- I am not saying they are all necessarily focused

21  on Guyana, is that there is a surprisingly high incidence of

22  drugs, it seems like usually cocaine, turning up in places

23  where -- which suggest that it has been somehow lost

24  from -- it was being smuggled and it ended up being lost by

25  the smugglers.  They lost track of it.

1          Similar to what happened in the JFK case with

2    luggage.  We are talking about cocaine shipments that end up

3    in food products and they find them at the supermarket and the

4    supermarket is not involved.  Or at least isn't -- nobody

5    believes that they had anything to do with it.

6          Certainly if there are cases that the US Attorney's

7    Office knows about that for one reason or another they decided

8    not to charge anybody with, I think that --

9          THE COURT:  Now I understand better.  Your defense

10   may be that he bought these and because of lax security in

11   Guyana, bad guys misplaced it, didn't necessarily intend to

12   have it end up in the luggage of Mr. Jerrick but had access to

13   the luggage because of the lax security and through some snafu

14   these drugs ended up in Jerrick's powdered milk.  Something

15   like that?

16         MR. SUNDARAM:  There are a few different possible

17   variations.  But in the end, what they all have in common is a

18   defense of lack of knowledge, and -- and a defense that our

19   client didn't have -- wouldn't have knowledge of exactly how

20   it happened but as his lawyers we should be able to not only

21   argue certain possible basis for reasonable doubt, but to

22   buttress those with some information that this isn't as

23   implausible as it otherwise might seem.

24         THE COURT:  Right.  You just are talking about

25   disclosure now and that's what we will address.

1          We are going to have some admissibility issues.

2   Even if the training manual, for example, said watch out for

3   these guys coming through Guyana because they -- because the

4   security is lax and drugs can wind up in the wrong suitcase,

5   you are going to have an admissibility issue.

6          You will fight that battle if and when you get to

7   it, right?

8          MR. SUNDARAM:  There is also the -- the fact that

9   until -- you know, there is an element of the unknown here.

10  Whether or not it's considered a fishing expedition, we don't

11  know exactly what the government may have and what they may

12  turn over and I think some of the admissibility issues may

13  depend on what it is exactly and, you know, say there may be a

14  difference between say reports and bulletins versus

15  information that the government uncovers in a particular case.

16         THE COURT:  Okay.  You would like, in terms of

17  concrete requests, you would like the training manual for the

18  drug interdiction people to the extent it addresses drug

19  traffic through Guyana.

20         MR. SUNDARAM:  Yes.

21         THE COURT:  Okay.  What else?

22         MR. SUNDARAM:  Back to I think the first topic that

23  we were discussing, the milk powder cans.  Although --

24  although if Your Honor were to expand -- expand that to

25  include coffee cans we --

GR        OCR        CM        CRR        CSR

1          THE COURT:  Did I say coffee cans before?

2          MR. SUNDARAM:  You did.

3          THE COURT:  What was it here?  Milk powder cans?

4          MR. LIFSHITZ:  Exactly.

5          THE COURT:  You would like me to expand that to

6    include cans containing other products?

7          MR. SUNDARAM:  I thought --

8          THE COURT:  Will you make such an inquiry?

9          MR. LIFSHITZ:  I will, Your Honor, yes.

10          THE COURT:  If I did, then I reiterate it.

11          MR. SUNDARAM:  And with respect to the second thing

12   that Your Honor said regarding an inquiry of the prosecutor's

13   office about corruption among airline employees --

14          THE COURT:  That should probably be airport

15   employees.

16          What were you going to say?

17          MR. SUNDARAM:  I -- I would -- I would ask that not

18   necessarily be limited to Caribbean Airlines, which is the

19   airline that my client traveled on but other airlines that fly

20   from out of that airport and I believe in the Weatherly-Adams

21   case, which is the JFK case that Your Honor was referring to

22   earlier, there was more than one airlines involved.  I think

23   there was Northwest Airlines and there was another airlines.

24          I can speak further with Doug Morris, the lawyer

25   involved in the Singh case.  I believe that there may have

1   been a situation where it actually -- the bag actually was

2   from one flight with one airlines and ended up on a passenger

3   in a different flight.  That's because the baggage handlers

4   were involved.

5          THE COURT:  Do you mean corruption that

6   includes -- your point about not limiting it to a particular

7   airlines strikes me as making all the sense in the world but

8   it strikes me that what I ought to ask the prosecutor to do is

9   ask around to see if there is any evidence in the government's

10  hands of corruption of airport employees around this period of

11  time, not just any old corruption but corruption that involves

12  the use of the baggage of unknowing travellers to conceal

13  drugs.  Right?  Otherwise, what, he has to go make sure people

14  didn't pad their expense accounts and stuff like that?

15         Do you agree with that?

16         MR. SUNDARAM:  Yes.

17         THE COURT:  Or do you think any old corruption ought

18  to be embraced in this?

19         MR. SUNDARAM:  I am not against an overbroad --

20         THE COURT:  I am speaking rhetorically.  I am going

21  to limit it no matter what your position is.

22         MR. LIFSHITZ:  May I speak briefly, Your Honor?

23         THE COURT:  Yes.  I am going to let you speak to all

24  of this.  I just want to get a laundry list first.

25         MR. LIFSHITZ:  Sure.

1          THE COURT:  Anything else in terms of targeting your

2   request?

3          MR. SUNDARAM:  Yes.

4          With respect to the -- to our -- I am quoting from

5   our original discovery letter.  I asked for any incidents in

6   which food product containers to be shipped from or through

7   Guyana have reportedly been opened or inspected by Guyana law

8   enforcement agents.

9          I didn't mean -- I don't mean by that request that

10  they have to have information -- that they have to go to

11  Guyana or -- that's -- that that request means anything in

12  their knowledge from cases where they learn that that's

13  happened.

14         THE COURT:  About food products being opened in

15  Guyana?

16         MR. SUNDARAM:  Yes, cases in which to their

17  knowledge that has happened or at least -- an incident of how

18  often that's happened.

19         THE COURT:  Okay.  What else?

20         MR. SUNDARAM:  I think that -- I think it is fair to

21  say that although I know you -- the Court hasn't actually made

22  a final ruling, you will hear from the government, but in

23  terms of what Your Honor is contemplating at this point, I

24  believe you've already covered the last two requests, which

25  are instances in which drugs -- and when I say allegedly have

1  been smuggled from Guyana by utilizing baggage handlers or

2  other airport -- or airlines personnel, I -- that would

3  include cases in which the government has information tending

4  to support such a claim and --

5          THE COURT:  So every single case in which a courier

6  claimed --

7          MR. SUNDARAM:  No.  I am saying, in which -- in

8  which the government has either dismissed a case where such a

9  claim has been made or has otherwise acknowledged the validity

10 of such a claim, anything supporting that.

11         And if -- and I think it -- I would also ask that if

12 the prosecutor has a question in his own mind that -- about

13 whether -- because one of the problems is, like in the Singh

14 case, when there is a dismissal it doesn't necessarily come

15 with an explanation.

16         THE COURT:  Right.  They are not required to

17 explain.

18         MR. SUNDARAM:  Exactly.

19         THE COURT:  What cabins the principle you rely on?

20 It is often the case that prosecutors exercise their

21 discretion not to prosecute someone who says they didn't do

22 it.  It happens across all range of offenses.

23         MR. SUNDARAM:  Which is why I am not -- I haven't

24 been asking for every case in which they decide not to

25 prosecute with someone charged with smuggling drugs.  I am

1  asking for cases in which that defense has been raised or that

2  claim has been made or they have information in their files

3  supporting the conclusion that that's what happened, that you

4  had a -- an unwitting passenger and that specific -- that

5  specific reason for dismissing a case, not just, you know, any

6  case in which they have chosen not to prosecute or dismiss.

7          THE COURT:  What justifies my -- that's an extremely

8  labor intensive task.  What rule of disclosure justifies that?

9          If three years ago there was a courier case

10  dismissed, you want me to require Mr. Lifshitz to go past the

11  fact that it was dismissed, speak to people to see if it was

12  dismissed not because of resource allocation issues but

13  because of a genuine belief on the part of some prosecutor or

14  some agent that the person might actually be innocent?  That's

15  what you want, that stuff?

16          MR. SUNDARAM:  Where the person might be innocent on

17  the ground, you know, based on a -- this unwitting passenger

18  defense.

19          THE COURT:  Right.  Describe for me a scenario in

20  which that would ever come to the attention of the jury in

21  this case.  If three years ago or ten days ago someone else

22  decided with regard to some other case that the mens rea was

23  either absent or couldn't sufficiently be proved beyond a

24  reasonable doubt, why would that go to a jury?

25          MR. SUNDARAM:  Again, it's not -- I am not talking

1    about any case in which the person lacked -- well, I don't

2    know if this is what Your Honor is talking about when you say

3    absence of mens rea.  I am talking about cases in

4    which -- I -- I think that what you are hitting upon is in one

5    aspect relevance.

6              THE COURT:  Yes.

7              MR. SUNDARAM:  Our position, and for this we

8    did -- we do rely heavily on Stever and --

9              THE COURT:  Forget Stever for a second.  I have read

10   Stever.  Let's talk about this case.

11             MR. SUNDARAM:  The argument is the reason the jury

12   should -- that is a legitimate -- that is something a jury

13   should learn about in terms of relevance is because even

14   if -- even if it happened a couple of years ago, the

15   defense -- when you have a defense in this case, that -- we

16   start with the prosecution.  What they have in this

17   case -- their theory is essentially that this person knew what

18   he possessed because people always know what they possess.

19   They don't have any admission from him.  I am not sure what

20   other evidence they may have or try to argue shows that.  But

21   that's -- in this case is basically possession and you know

22   what's in your suitcase and you know what's in the container

23   in your suitcase.

24             Our position is that when we are -- if we are going

25   to, you know, be left to argue to the jury that, you know, he

1   didn't necessarily know and you shouldn't assume that somebody

2   knows, in this case you shouldn't, I believe that we should be

3   allowed to get in front of the jury and part of this is based

4   on our constitutional right to present a defense, even if the

5   Rules of Evidence don't support us but I think they do because

6   I think that in a case where you are trying to argue something

7   to a jury that may otherwise just seem implausible, I think it

8   does make it more likely than otherwise it would be for that

9   to have been the case if -- if we are able to present to the

10  jury evidence that this actually -- this seemingly implausible

11  thing has actually happened before or does happen.

12          THE COURT:  Because Mr. Lifshitz or one of his

13  colleagues chose a couple of years ago to dismiss a case

14  against someone whose luggage contained cocaine, that makes it

15  more probable, makes it more likely that your client didn't

16  know there was cocaine in the cans?

17          MR. SUNDARAM:  Well, what -- what makes it more

18  likely than it would be without the evidence is the

19  proposition which is a basis for reasonable doubt that just

20  because it was in his -- it was in his luggage and it was

21  inside those unopened cans, that doesn't mean that -- you

22  know, whenever that happens, the person knew what was in it.

23  It is a challenge --

24          THE COURT:  Jurors know that.  I think you are

25  underestimating jurors.

22

1          I don't think there is any probative value in it.

2     Even if there were, then I imagine the government would want

3     to distinguish that case from this one and then I'd end up

4     trying both.  I am not going down this road.

5          MR. SUNDARAM:  This is at this point a discovery

6     request and -- and so I would ask that Your Honor reserve

7     judgment in terms -- to see what -- this may not -- I don't

8     think this is necessarily -- I don't envision this necessarily

9     being -- bringing out all the facts of that case and comparing

10    it to this case.

11         THE COURT:  I understand your application.

12         What else?

13         It is denied, before I forget.

14         I am not going to require the government to do that.

15    I don't think there is a ground for me to do so in the

16    disclosure rules or statutes or the constitutional disclosure

17    requirements.

18         (Pause.)

19         MR. SUNDARAM:  My -- my related request is for

20    information within the government's possession of other

21    instances in which -- in which -- in which narcotics have been

22    found in -- in the stream of commerce, as in a supermarket.

23    Because -- because one possible -- one possible defense in

24    this case is that -- is not that there was some corruption by

25    airline employees but that there was actually cocaine in the

1  first place at the supermarket -- I'm sorry -- where

2  the -- where the milk powder was purchased.

3          THE COURT:  So you want them to find out where drugs

4  were found in a supermarket?

5          MR. SUNDARAM:  I want them to disclose cases that

6  they have within their -- within their knowledge

7  where -- again, this -- we are talking about cases that may

8  have ended up not being -- cases that may have ended up being

9  dismissed, where the claim is similar to the claim my client

10 made in this case to the government, which is that he

11 bought -- he bought something that was not -- you know, food

12 product and it turned out to have cocaine and I am talking

13 about cases where it was at the place where he bought it.

14         THE COURT:  At the place where he bought it?

15         MR. SUNDARAM:  I'm sorry.  Your Honor was focusing

16 on the unwitting passenger.

17         THE COURT:  Right.

18         MR. SUNDARAM:  I'm asking for the same types of

19 cases which involve an unwitting consumer within the

20 government's knowledge.

21         THE COURT:  So --

22         MR. SUNDARAM:  That person is just as innocent

23 as -- has the same lack of a culpable mental state as an

24 unwitting passenger.

25         THE COURT:  People who bought supermarket products

1    and it turns out there were drugs in it?

2              MR. SUNDARAM:  Yes.

3              THE COURT:  All right.  Denied.

4              Anything else?

5              MR. SUNDARAM:  No.

6              THE COURT:  I will hear from Mr. Lifshitz.  You

7    wanted to be heard, Mr. Lifshitz.

8              MR. LIFSHITZ:  Yes.  Thank you, Judge.

9              I will try to be brief.

10             We have heard now, it is undisputed,  that in this

11   case the drugs were not found just in the suitcases in some

12   false bottom or somewhere where they could be snuck in but in

13   cans that the defendant admitted right away he bought and he

14   had a receipt in his pocket for them.  So the fact that there

15   might be other cases where someone like a corrupt airport

16   employee smuggled drugs through someone's suitcase has no

17   relevance to this case because there is no reason someone

18   wanting to use a dupe would put drugs within cans that would

19   require displacing the milk powder and, I suppose on the

20   New York side of the trip, taking the cans and drawing the

21   passenger's attention to this conspiracy.

22             I think even the narrow category of cases where a

23   corrupt baggage handler smuggled drugs through someone's

24   suitcase is completely irrelevant to this case.

25             We have heard about potential defenses ranging from

1    the corrupt baggage handlers to, I guess the last one was, the

2    cocaine was already in the cans when he bought them in the

3    supermarket market.  That's exactly why these requests don't

4    state a prima facie case.  A potential defense or a request

5    for material that may be relevant to the defense just isn't

6    good enough.  There are cases I cite on page 17 of the brief

7    that say that.

8              If he doesn't know what his defense is -- he has no

9    obligation to say here in open court what his defense

10   is -- but if he wants a wide range of material, he is

11   obligated to explain why it is relevant to his defense in this

12   case.

13             Training material from ICE and the DEA was

14   mentioned.  Those are separate agencies.  I will, of course,

15   do whatever the Court directs.  I don't know that ICE and the

16   DEA would be willing to give me training material.  It is

17   generally distributed to law enforcement officers.

18             If they do, as has been suggested, I can't imagine

19   how that would be admissible if people are generally

20   instructed that drugs are smuggled form Guyana.  I don't know

21   that would be in the material.  But something like that, I

22   don't know who would get that in or why it would be allowed to

23   go to a jury.

24             The same thing for instances in which Guyanese law

25   enforcement opened food containers.  They could do that for

1   any number of reasons.  Importing food is a separate issue

2   from whether there are drugs in them.  There are probably food

3   containers opened every day in every international airport in

4   the world.  That strikes me as a huge fishing expedition.

5                 I believe that's all.

6                 Other than to the extent the Court orders me to make

7   inquiries, I would just like to make clear what the inquiries

8   are and I will state a proposal for how I will do that just so

9   we are all on the same page.

10                THE COURT:  Okay.

11                MR. LIFSHITZ:  I don't think any inquiries along the

12  lines the defense requests are appropriate, however.

13                THE COURT:  Thank you, Mr. Lifshitz.

14                Anything further?

15                MR. SUNDARAM:  Yes, Your Honor.

16                I think -- I just think that what Mr. -- the

17  arguments Mr. Lifshitz is making directed towards relevance

18  are arguments that could be made to the jury and don't

19  make -- don't make something not relevant.  I think

20  what -- his arguments would make -- they are arguments that go

21  to the weight of that evidence, not it's admissibility.

22                And with respect to the opening of the packages, it

23  is -- in this case, the government is alleging that my client

24  bought milk powder at the store in Guyana and then himself

25  opened it and replaced it with cocaine.  I believe.  Or -- or

1    in conjunction with somebody else who was supplying it to him.

2          I think that it should be fair game for, you know,

3    for us to explore at least for discovery purposes instances

4    within the government's knowledge where food products have

5    been opened by other people who had access to that -- other

6    than the passenger or the consumer.

7          THE COURT:  Okay.  Thank you both.

8          I do think it gets slippery, arguing about the

9    merits of a prospective defense and whether someone is

10   entitled to raise it.  I think I heard probably every

11   plausible and even some implausible arguments associated with

12   containers found in the luggage of couriers.  You can't hang

13   around these courtrooms for as long as I have without having

14   heard them all.

15         I am going to grant the application but only in

16   part.  To the extent I don't grant it, I am going to deny it.

17         I am going to ask Mr. Lifshitz to make inquiry.

18   This seizure here was July -- your brief says July 25, 2010.

19   I assume it's 2009.

20         MR. LIFSHITZ:  2009, yes, Your Honor.

21         THE COURT:  Why don't we pick a time period of

22   July 5, 2009, and let's expand it six months backward, please,

23   time period and we may as well advance it six months past it

24   as well.  So the year surrounding July 5, 2009.  I would like

25   you to inquire as to whether there is any information, law

1  enforcement information, about the use of food containers to

2  smuggle drugs in the luggage of innocent dupes.

3          I don't mean when I say "information" whether

4  someone who got arrested says that he or she was innocent.  I

5  mean, evidence or information supporting a law

6  enforcement -- supporting that view.

7          Do you understand the distinction?

8          If it gets dicey, I want you to err on the side of

9  giving it to me.

10          MR. LIFSHITZ:  Yes, Your Honor.

11          THE COURT:  All right?

12          MR. LIFSHITZ:  Yes.

13          THE COURT:  I will look at it.

14          But it seems to me if there were -- just to make a

15  point by exaggeration -- if there were 50 cases last July

16  involving food containers to smuggle drugs and there were

17  reports in DEA or ICE or whoever does this stuff that

18  supported the view that some other entity was using innocent

19  dupes, however silly that may be, however silly -- I know

20  these arguments -- however silly you may think it is to

21  entrust that value of merchandise to an innocent dupe, if

22  there is information in the law enforcement files that would

23  tend to support that argument, I want you to disclose it.  And

24  if there is such information and you still think you shouldn't

25  disclose it, I want you to give it to me.

GR      OCR      CM      CRR      CSR

29

1       Understood?

2       MR. LIFSHITZ:  Yes, Your Honor.

3       THE COURT:  Second, any information, if there is

4  corruption among airport employees, that took the form in

5  substance of using the luggage of unwitting passengers to

6  bring into the country controlled substances.

7       The application for disclosure of information

8  relating to the incidence of opening food containers in Guyana

9  is denied.

10      The application for disclosure of the training

11  materials is denied.

12      I don't think it is sufficiently germane to the

13  prospective defense as stated to require me to grant those

14  applications.

15      If I haven't addressed your disclosure applications

16  specifically, they are denied.

17      Understood?

18      MR. SUNDARAM:  Yes.

19      I do have one question --

20      THE COURT:  Yes.

21      MR. SUNDARAM:  -- about your ruling.

22      Now, Your Honor did mention, you know, your own

23  familiarity the -- the JFK case, which I understand was 2003,

24  2004.  Our office has a case which I mentioned was a -- People

25  against Singh and that case was dismissed and I think it was

30

1    tangentially related and it was a case where there was

2    misplaced luggage from that case involved baggage handler

3    corruption.

4           Is Your Honor's ruling that even if we had -- even

5    if we were able to get information from that file, that's too

6    remote?  Is that the -- because it's --

7           THE COURT:  I haven't ruled on the remoteness of

8    what information you get from that file.  I have simply denied

9    your requests to the extent I haven't granted them.

10          MR. SUNDARAM:  I understand.

11          That would include our request for -- since we

12   mentioned that case in particular, because it's the one that

13   we are aware of, for information --

14          THE COURT:  What is it you want from that file that

15   you don't have?  What do you want from the file of that case

16   that you don't have?

17          This is a fellow who was a codefendant of DeFreitas

18   or something like that?

19          MR. SUNDARAM:  No.

20          THE COURT:  What is it?

21          MR. SUNDARAM:  This is a person who was prosecuted

22   the same time as Weatherly and Adams.

23          THE COURT:  Singh is the 2003 case?

24          MR. SUNDARAM:  Yes.

25          THE COURT:  I've got it.

GR      OCR      CM      CRR      CSR

31

1          MR. SUNDARAM:  And based on what you asked the

2   government to turn over, if it exists, in the 2009 timeframe,

3   we believe that exculpatory information would be in the Singh

4   file which may not have been disclosed to us because I don't

5   think -- that case didn't get to --

6          THE COURT:  That's the 2003 case?

7          MR. SUNDARAM:  That was dismissed.

8          THE COURT:  Yes.  I have denied that.

9          We have a Monday trial date.  So you have to move

10  quickly.

11         MR. LIFSHITZ:  Yes, Your Honor.

12         THE COURT:  Within your office.

13         MR. LIFSHITZ:  Yes.

14         THE COURT:  Ask the relevant agency or agencies.

15  All right?

16         MR. LIFSHITZ:  Okay.  One final question, Your

17  Honor.

18         THE COURT:  Yes.

19         MR. LIFSHITZ:  Are these requests that I am going to

20  make limited to instances involving Guyana, importation from

21  Guyana or from anywhere?

22         THE COURT:  No.  From anywhere.

23         If this turns into a rat's nest of information, we

24  will sort it out later.  Let's gather, let's see what's out

25  there, if anything, first.

32

1          Okay?

2          MR. LIFSHITZ:  Yes, Your Honor.

3          THE COURT:  Thank you.

4          Have a good day.

5          MR. SUNDARAM:  Thank you.

6          (Matter concludes.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GR      OCR      CM      CRR      CSR